WINSLOW WARREN, trustee, *vs.* STREET COMMISSIONERS
OF THE CITY OF BOSTON.

Suffolk. November 19, 1901.— March 1, 1902.

Present: HOLMES, C. J., KNOWLTON, LATHROP, & HAMMOND, JJ.

*Assessments,* For benefits. *Statute. Municipal Corporations.*

Where a statute authorizing the extension and construction of a city street pro-
vides, that when about to do any work or make any purchase the estimated
cost of which amounts to or exceeds $2,000, the superintendent of streets "shall,
unless the mayor give a written authority to do otherwise, invite proposals
therefor by advertisements" published in a certain way, an indorsement of
approval by the mayor on the contract after it is made and a similar indorse-
ment at that time on the request for permission to dispense with advertising for
bids, are not a sufficient compliance with the statute.

If an assessment for betterments from the widening and extension of a city street
is invalid, because a large part of the expense was incurred in violation of the
provisions of the act authorizing it, it is immaterial whether or not the cost was
greater than it would have been if the act had been complied with, and it also
is immaterial that a sum considerably in excess of the amount of the betterment
assessments was expended legally, as the assessment in such a case is for the
benefit from the whole widening and extension and is not confined to the bene-
fit from the money expended legally.

PETITION, filed October 29 and amended November 9, 1900,
for a writ of certiorari to quash the proceedings of the mayor
and street commissioners of the city of Boston in assessing bet-
terments under St. 1894, c. 416, which authorized the street com-
missioners to extend, widen and construct Huntington Avenue
from Copley Square in Boston to the town of Brookline.

The case came on to be heard before *Lathrop,* J., who, at the
request of the parties, reserved it upon the petition, the amend-
ment thereof, the answers, the return of the respondents and
the agreed facts for the consideration of the full court.

*M. Storey,* (*C. Warren & G. Perry* with him,) for the
petitioner.

*A. J. Bailey,* (*P. Nichols* with him,) for the respondents.

HAMMOND, J. This is a petition for a writ of certiorari to
quash the proceedings of the street commissioners of the city
of Boston, assessing a betterment tax on the estate of the peti-

tioner, on account of the widening and extension of Huntington Avenue.

The statutes authorizing the widening and extension provided that the work should be done with all reasonable dispatch by the superintendent of streets; and directed first, that it should all be done by contract, second, that the number of contracts should not exceed five, each to be subject to the approval of the mayor, and third, that when the superintendent was about to do any work or to make any purchase the estimated cost of which amounted to or exceeded $2,000, he should, unless the mayor gave a written authority to do otherwise, "invite proposals therefor by advertisements in not more than four daily newspapers published in said city, such advertisements to state the time and place for opening the proposals in answer to said advertisements," and reserving the right to reject any or all proposals. Sts. 1890, c. 418, § 4; 1891, c. 323, §§ 10, 12, 13; 1894, c. 416, § 4.

The order for the widening and extension was passed by the street commissioners and approved by the mayor January 5, 1895. It provided as a part of the work that a sewer should be constructed, and it determined and prescribed the kind of surface of the street, the height and width of the sidewalks, the location and size of the sewer, with the catch basins and manholes to be connected therewith, and the materials for the construction of the whole work, both street and sewer, all as required by St. 1891, c. 323, § 10.

With these statutes and this order before him as his authority and guide, the superintendent of streets in due time went to work. As to the sewer he divided it into six sections and made six contracts, one for each section each exceeding $2,000 in amount, the total amounting to more than $34,000. As to a part of the rest of the work, he made twelve contracts, every one of which, except two, was for more than $2,000, the total amounting to more than $120,000. The two above excepted were for more than $600 each, and one of them was not approved by the mayor. One of these twelve contracts, that of October 14, 1895, with O'Rourke and Company, amounting to more than $4,000, the estimated cost being over $2,000, was executed and the bond given without first getting the per-

mission of the mayor to dispense with advertising for bids, but the request for such permission and the contract were both some days afterward indorsed " Approved" by the mayor. This subsequent approval, however, was not a sufficient compliance with the statute. *Bowditch* v. *Boston*, 168 Mass. 239, 243. The same state of things existed as to the contract of April 11, 1896, with one Miller, amounting to $4,358. In the case of another one of these twelve, that of the Boston Bridge Works, amounting to $2,646, there was only a proposal in writing by the company accepted by the superintendent of streets. The mayor did not authorize dispensing with advertisements for bids nor approve of the contract in writing.

But this is not all nor nearly all. A large, if not the greater, part of the labor upon the avenue was done absolutely without any contract therefor whatever. The superintendent did the work, employing the regular workmen in the street department at the usual daily wages paid by the city. No estimate was made of the cost of this labor before it was performed, no advertisements for bids were made, nor were there 'any contracts made as to it. This course was taken in pursuance of communications from the superintendent to the mayor, of which the following under date of March 25, 1896, (omitting immaterial parts,) is a fair specimen : " I am about to excavate and sub-grade Huntington Avenue from Copley Square to the Brookline line, the estimated cost of which exceeds $2,000. This work can be done by my regular men, thereby keeping them employed instead of making a contract therefor, in which case no advertisement will be required. I therefore respectfully request your permission to dispense with such advertisement." These communications were marked " Approved" by the mayor.

The amount expended in this way for labor, engineering, inspecting, teaming, etc., in building the roadway, was more than $95,000, of which about $55,000 was spent in labor and about $37,000 in teaming. In the same way there was expended in superintendence, labor, advertising and teaming in building the sewers, in addition to the amount of the six contracts therefor above named, $17,500, and also $3,700, upon the second section of the sewer ; and all without making any

estimate of the cost, without advertising for bids, or making any contract.

As to the materials used in the work, it appeared that it is the custom of the superintendent to make, at the beginning of the year, contracts as required by law for supplying the city with paving-blocks, edgestones, gravel, brick, flagging and lumber, and to use the same whenever required for the various pieces of street construction, charging the cost of the amount used as a part of the construction at the prices paid in such contracts; and it further appeared to be his custom to make leases of ledge lots for quarrying stone, and in some of these leases to make contracts for taking the stone from the quarry to the stone crushers owned and worked by the street department. The city by its employees crushes the stone and uses the crushed stone wherever required for the various pieces of street construction, charging the same as a part of the cost of such construction, at prices determined by the superintendent to be the actual cost thereof. It was further his custom to furnish to contractors such materials at the prices determined as aforesaid. This custom was followed in constructing this avenue, and such materials were furnished to the amount of $117,000, as to which no bids were advertised for or contracts made, except under this annual custom. The crushed stone so used, amounting in value to $32,000, was used by the approval of the mayor first obtained. Much of such material was furnished to the contractors by the department. It is thus seen that instead of advertising for bids to furnish paving-blocks, gravel, edgestones, flagging, brick, etc., for the construction of this avenue, and making contracts therefor at the time of construction requiring the contractors to include the item of materials in their contracts, the superintendent purchased all the materials in bulk at the beginning of the year, charged to the cost of this avenue the amount of materials used in its construction by him, at the price paid by the city therefor, as fixed by him. And as to the crushed stone, the price of this charge was such as the superintendent determined to be the cost. The total cost of constructing the avenue and sewer, as certified by the superintendent to the city auditor, is about $380,000, but the whole amount expended under the order of the commissioners, including land

damages, is $676,000, of which about $340,000 has been assessed upon those specially benefited, as a betterment tax. The petitioner's tax is about $800.

The contrast between what the statutes required and what was done is striking. The statute required the work to be done by contract; less than half the expense of construction was so done. The statute permitted only five contracts for the whole work; the superintendent made seventeen, and then not half the cost was covered by them. Work amounting to nearly $100,000 has been done by city laborers, and materials to the amount of more than $100,000 have been furnished without any contract whatever, except the annual contract above stated. The superintendent also has made contracts to the amount of several thousand dollars without advertising for proposals, and without antecedent written authority from the mayor to dispense with such advertisement, although after the contracts were made the mayor in most cases gave the authority and approved the contracts as made.

In a word, this great work, requiring the expenditure of about $675,000, of which about $380,000 has been expended under the supervision of the superintendent and the mayor, has been carried out so far as respects this last sum with a plain, direct and persistent disregard of the requirements of the law ; and such disregard has not been confined to some insignificant or comparatively unimportant parts of the work, but it has been general and radical, and the whole has been affected by it. The requirements of the statute that the work shall be done by contract, that the number shall be limited to five, and that where the estimated cost of the thing to be contracted for equals or exceeds a certain sum there shall be a public advertisement for bids, are substantial, and were intended to give to the taxpayers the benefit of competition among those desiring to do the work, as well as the benefit of the difference between a wholesale and a retail price as applicable to it. They were further intended to prevent the practice of dividing a large work into various parts, so that instead of one contract there might be several contracts, each so small as not to call for advertisement ; and all this was for the purpose of preventing those methods of extravagance, favoritism and corruption

which sometimes arise in the absence of some such statutory restriction, and which are too familiar to need any extended description.

It is no answer to say that it does not appear that the cost of the undertaking has been any greater than if done in exact compliance with the requirements of the statutes. Whether the cost be greater or less it is impossible for us to say. The Legislature prescribed a certain method of doing the work as a safeguard against fraud and abuse which, when committed, it would be difficult, if not impossible, to detect or remedy. The intention was to prevent evil rather than to attempt to detect and expose it when done. The taxpayer has the right to insist that these provisions which have been made for his protection shall be observed, at least so far as they affect him. The chance of detecting fraud and corruption liable to occur if the work is done in another way than that prescribed by law is no adequate substitute in the opinion of the law making power for the safeguards thus given him. Such a divergence from the law as is shown in this case is substantial, and the assessment, so far as it depends upon the lawfulness of these acts is invalid. *Bowditch* v. *Boston*, 168 Mass. 239, and cases cited.

It appears however that one of the items of the cost was the sum of $288,176, for land damages, and there is no contention that there was any illegality about this expenditure. It further appears that two of the contracts, namely, that of the Boston Asphalt Company for $46,000, and that of H. Gore and Company for $28,435, were legally made, unless the fact of there being more than five contracts rendered them illegal. These three items amount to $362,611, a sum considerably in excess of the amount of the betterment assessments, which is $338,878. The assessments were based upon the special benefit received from the widening and extension as a whole, and it is contended by the respondents that, inasmuch as the amount assessed is less than the amount legally expended, and no more than the benefit received, the assessment upon the petitioner is no more than his proportional share of the expense legally incurred; that the fact that some other expenditures were illegally made is immaterial as to him under the circumstances of this case, and that consequently the court in the exercise of its discretion

should decline to issue the writ of certiorari to quash the assessment.

But the difficulty with this position is that, as stated by the respondents, the assessment is for the benefit of the whole widening and extension. It is not confined to the benefit received only from money which was legally expended, but it includes the benefit received from that which was illegally expended. Upon this petition we cannot say what would have been the assessment, or what it should be if confined to the former class of expenditures, if indeed such an assessment can be legally made.

*Writ of certiorari to issue.*